```
SCOTT T. McCLIMANS,              )
                                 )
          Plaintiff,             )
                                 )
     vs.                         ) Civil Action No. 07-1201
                                 )
COMMISSIONER OF SOCIAL           )
SECURITY,                        )
                                 )
          Defendant.             )
```

## MEMORANDUM OPINION

### I. INTRODUCTION

Plaintiff, Scott T. McClimans, seeks judicial review of a decision of defendant, Commissioner of Social Security ("the Commissioner"), denying his application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-433.[1] Presently before the Court are the parties' cross-motions for summary judgment pursuant to Fed.R.Civ.P. 56. For the reasons set forth below, Plaintiff's motion for summary judgment will be granted to the extent that this case will be remanded for further proceedings. In all other respects, Plaintiff's motion for summary judgment will be denied, and the Commissioner's cross-motion for summary judgment will be denied.

---

[1]Title II of the Social Security Act provides for payment of insurance benefits to disabled workers who have contributed to the Social Security Program. Plaintiff's earnings record shows that he has acquired sufficient quarters of coverage to remain insured for purposes of eligibility for DIB through December 31, 2008. (R. 11).

1

## II. Background

### A. Procedural History

On March 3, 2004, Plaintiff sustained serious injuries in a work-related motor vehicle accident.[2] He filed an application for DIB on June 29, 2005, alleging disability since the date of the accident due to "whip lash, facial injuries, chronic headaches." (R. 70-72, 83-84). Plaintiff's application for DIB was denied on October 20, 2005. (R. 58-62). On November 1, 2005, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). (R. 58-63). At the hearing, which was held on April 3, 2007, Plaintiff, who was represented by counsel, and a vocational expert ("VE") testified. (R. 26-54).

On April 27, 2007, the ALJ issued a decision denying plaintiff's application for DIB. Specifically, the ALJ concluded that Plaintiff retained the residual functional capacity ("RFC") to perform a range of light work existing in significant numbers in the national economy.[3] (R. 11-24). On May 17, 2007,

---

[2]Plaintiff was in the course of his employment with Hanson Automotive as a mechanic's helper at the time of the March 3, 2004 motor vehicle accident. (R. 193).

[3]RFC is the most a disability claimant can still do despite his or her physical or mental limitations. 20 C.F.R. § 404.1545(a). Light work "involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 404.1567(b).

Plaintiff requested review of the ALJ's decision, which was denied by the Appeals Council on July 13, 2007. (R. 4-7). This appeal followed.

## B. Factual Background

Plaintiff's date of birth is May 19, 1965. (R. 70). He is a high school graduate, as well as a trained electronics technician. (R. 39, 385). At the time of the administrative hearing, Plaintiff was residing with his wife and 18 year old son. (R. 32). In the past, Plaintiff has been employed as a baker, a laborer and a factory electrician. On March 3, 2004, the date of the motor vehicle accident, Plaintiff was laid off from his job as a factory electrician. As a result, he was working as a mechanic's helper for an auto repair shop until he was called back to work.[4] (R. 38-39, 84).

With respect to daily activities, Plaintiff is able to care for his personal hygiene and prepare something to eat. (R. 32). He watches television during the day, and he occasionally does the dishes. Plaintiff goes to church once or twice a week. (R. 40). Plaintiff has a driver's license and he drives occasionally. (R. 31). As to hobbies, at the time of the administrative hearing, Plaintiff was learning how to draw

---

[4]In fact, Plaintiff was called back to his job as a factory electrician. However, Plaintiff claims that he was unable to return to work as a result of the injuries sustained in the March 3, 2004 motor vehicle accident. (R. 39).

3

because he could no longer do woodworking, go hunting or play
softball at his church due to the injuries sustained in the March
3, 2004 motor vehicle accident. (R. 41).

## C. Vocational Expert Testimony

As noted previously, a VE testified at the hearing on
Plaintiff's application for DIB on April 3, 2007. Initially, the
VE classified Plaintiff's past work under the Dictionary of
Occupational Titles. The VE testified that a laborer is an
unskilled job at the heavy exertional level, a baker and a
mechanic's helper are semi-skilled jobs at the heavy exertional
level, and an electrician is a skilled job at the heavy
exertional level. (R. 45).

The ALJ then asked the VE whether jobs existed for a
hypothetical individual of Plaintiff's age, education and work
experience who is limited to work at the light exertional level
that involves simple, routine tasks and does not require overhead
reaching or operation of hazardous machinery. The VE responded
affirmatively, citing the jobs of an unarmed guard (335,000 jobs
nationally), a bench assembler of very small products (737,000
jobs nationally) and a hand worker (trimming, cutting, etc.)
(115,000 jobs nationally). (R. 45-46).

The ALJ then asked the VE what effect the following facts,
which were based on Plaintiff's testimony, would have on the
hypothetical individual's ability to do the cited jobs: (1) the

4

individual has occasional incapacitating headaches; (2) the
individual has memory problems; (3) the individual suffers from
neck pain at a level of 3 (out of a possible 10 levels) with
medications; and (4) the individual's daily medication regime
includes Morphine for pain. In response, the VE testified that
the hypothetical individual could still perform the jobs cited in
response to the ALJ's initial hypothetical question because the
jobs are "very entry level type positions." (R. 47-48).

Lastly, Plaintiff's counsel asked the VE whether an employer
would be willing to hire an individual who took narcotic
medications on a daily basis to control pain. In response, the
VE testified that the "majority" of employers would not hire such
an individual. (R. 49-50).

## D. Medical Evidence

The extensive medical evidence in Plaintiff's administrative
file may be summarized as follows:

On March 3, 2004, Plaintiff sustained serious injuries in a
motor vehicle accident, including a complex laceration of the
oral vestibule, an intermediate laceration of the lower lip and
intranasal lacerations.[5] He was transported to UPMC Horizon
Hospital where x-rays revealed no evidence of acute fractures of

---

[5]According to various medical records, Plaintiff was rear-
ended by another vehicle and his car was forced into a ditch.
During the accident, Plaintiff's face hit the steering wheel of
his vehicle, resulting in extensive facial injuries.

5

the facial bones, the nasal bones or the cervical spine.
Plaintiff was taken to the operating room for suture repair by
Dr. Gabriel O. Te. He was discharged the next day. (R. 125-55).

Plaintiff saw Dr. Te for a follow-up visit on March 9, 2004.
Dr. Te noted that Plaintiff had done very well post-operatively
with "just numbness and sensitivity around the upper teeth which
is expected from the injury." Plaintiff informed Dr. Te that he
was traveling to the Dominican Republic the following week to
build a church, and Dr. Te advised him to take reasonable care
not to get hit in the nose. Plaintiff was given a prescription
for Ibuprofen to use as needed for pain,[6] and he was discharged
from postoperative care by Dr. Te. (R. 211).

On March 22, 2004, Plaintiff was seen by his dentist,
Richard A. Shelestak, DMD, due to concerns about his front teeth.
Dr. Shelestak noted that Plaintiff's four upper anterior teeth
had been affected when his face hit the steering wheel during the
motor vehicle accident on March 3, 2004. All four teeth showed
slight mobility and pain to percussion. In addition, Plaintiff
indicated that his bite was off. Dr. Shelestak did not perform
any procedures on Plaintiff during that visit, choosing instead
to wait and see if any further problems developed. (R. 156).

_____

[6]Prescription ibuprofen is used to relieve mild to moderate
pain. _See_ www.nlm.nih.gov/medlineplus/druginfo (last visited
6/20/2008)

6

On March 23, 2004, Plaintiff returned to his surgeon, Dr. Te, complaining of a "very bothersome" headache that he believed may be related to the surgery performed to repair his facial lacerations following the motor vehicle accident. Dr. Te noted that Plaintiff's headache, which was not relieved by over-the-counter Ibuprofen, started a week after he returned from the Dominican Republic. Dr. Te's examination of Plaintiff revealed no evidence of wound infection or abscess, and he concluded that the objective pathology was consistent with acute rhinitis.[7] Dr. Te prescribed medication for Plaintiff for rhinitis, instructing Plaintiff to return in several days if his headache did not improve significantly. (R. 210).

On April 2, 2004, Plaintiff was seen by his primary care physician, Thomas Pineo, M.D., to follow-up on the injuries he sustained in the motor vehicle accident. Plaintiff's physical examination revealed focal tenderness along the entire right paracervical musculature. Dr. Pineo noted that Plaintiff had been seeing a chiropractor for this problem which was "helping some."[8] Dr. Pineo's assessment was sinus fracture injury with

---

[7] Rhinitis is a condition that causes a constant runny nose, sneezing and nasal congestion. *see* www.nlm.nih.gov/medlineplus/encyc (last visited 6/20/2008).

[8] Plaintiff's administrative file includes records from his chiropractor, Brett A. Keyser, D.C., showing that he was treated by Dr. Keyser several times a week between March 2004 and July 29, 2005. (R. 298-371).

7

chronic pain and whiplash injury with ongoing pain in the cervical spine. Dr. Pineo prescribed Lortab and Flexeril for Plaintiff,[9] cautioned against aggressive manipulative therapy by the chiropractor, recommended follow-up with Dr. Te regarding the facial pain and "undoubted" sinus abnormalities,[10] and scheduled a CT scan of Plaintiff's sinuses. (R. 295). The CT scan, which was performed on April 8, 2004, was within normal limits. There was no evidence of sinus inflammatory disease. (R. 296).

On April 28, 2004, Plaintiff returned to the dentist for further evaluation of his front teeth. Although the mobility of the teeth had resolved, Plaintiff continued to experience slight pain to percussion and his bite was off. Dr. Shelestak corrected Plaintiff's bite and informed him that he may need root canal therapy in the future due to the trauma sustained in the motor vehicle accident. (R. 156).

---

[9]Lortab is a combination of drugs used to relieve moderate to moderately severe pain. One of the drugs in Lortab (Hydrocodone) can be habit-forming. Flexeril, a muscle relaxant, is used with rest, physical therapy and other measures to relax muscles and relieve pain and discomfort caused by strains, sprains and other muscle injuries. *See* www.nlm.nih.gov/ medlineplus/druginfo (last visited 6/20/2008).

[10]With regard to Dr. Pineo's reference to "undoubted" sinus abnormalities, he noted that Plaintiff's nose had been partially amputated in the motor vehicle accident and was "repaired beautifully" by Dr. Te with no cosmetic deformity remaining. (R. 295). Similarly, during the administrative hearing, Plaintiff testified that his nose was "actually ripped ... off" during the motor vehicle accident. (R. 38).

8

On May 3, 2004, Plaintiff presented to Dr. Pineo with complaints of left shoulder pain which Plaintiff apparently reported had begun after the chiropractor had worked on the shoulder. Plaintiff's physical examination revealed marked tenderness and limited range of motion in the left shoulder, and Dr. Pineo administered a steroid injection to the shoulder. Following the injection, Plaintiff reported a 40% improvement in his pain, although a "toothache-type" pain persisted. Dr. Pineo noted that an MRI of Plaintiff's left shoulder, which had been ordered by the chiropractor, was pending,[11] and Plaintiff was instructed to return in one month. Dr. Pineo also refilled Plaintiff's prescriptions for Lortab and Flexeril. (R. 295).

During a follow-up visit with Dr. Pineo on June 4, 2004, Plaintiff reported that he was receiving ongoing manipulative therapy by the chiropractor; that his left shoulder pain was almost resolved; and that he continued to have "rather severe" suboccipital pain with radiation into his temples bilaterally. Dr. Pineo injected Plaintiff's suboccipital musculature after which Plaintiff's pain was "much improved." Dr. Pineo changed

---

[11]The MRI of Plaintiff's left shoulder was taken on May 3, 2004. The impression was described as follows: "(1) MILD DEGENERATIVE CHANGE OF THE AC JOINT, NO IMPINGEMENT, NO EVIDENCE OF ABNORMAL WIDENING OF THE AC JOINT SPACE, OCCULT FRACTURE OR BONE CONTUSION; (2) NO CUFF TEAR OR TENDONITIS; (3) GLENOID LABRUM AND BICEPS TENDON ARE INTACT; and (4) TINY AMOUNT OF FLUID IN THE SUBDELTOID BURSA." (R. 361).

9

Plaintiff's muscle relaxer to Skelaxin and increased his dosage of Lortab. Plaintiff was instructed to return in a month. (R. 293). Subsequently, Dr. Pineo ordered an x-ray of Plaintiff's nasal bones. The x-ray, which was performed on June 28, 2004, revealed no evidence of fracture. However, there appeared to be a mild leftward deviation of the nasal septum. (R. 294).

On June 30, 2004, Plaintiff was evaluated by John G. Wassill, III, M.D., a physiatrist, for possible nerve root compression in the neck due to his ongoing complaints of severe neck pain and headaches. Dr. Wassill noted that Plaintiff also suffered from left-sided shoulder pain, but that a steroid injection had helped "significantly." With respect to past medical history, Dr. Wassill noted that, as a child, Plaintiff had been diagnosed with Eulenburg's paramyotonia congenita, an inherited disease marked by tight muscle contraction when muscles are exposed to cold temperatures. At Dr. Wassill's request, nerve conduction studies were performed in the muscles of Plaintiff's arms. Except for Plaintiff's congenital myotonia, there was no evidence of nerve root compression or peripheral nerve damage in his arms. (R. 158-62).

On July 12, 2004, Plaintiff was seen by Dr. Pineo. During this follow-up visit, Plaintiff described the specific chiropractic treatment he was receiving, some of which was

10

beneficial. Dr. Pineo continued Plaintiff on Skelaxin for muscular spasticity and Lortab for pain. (R. 292).

During his follow-up visit with Dr. Pineo on August 24, 2004, Plaintiff reported that he had run out of his Lortab prescription the previous Saturday; that his headaches had been "a little bit more severe;" that he was experiencing memory problems; that he continued to see the chiropractor three times a week; and that he used a cervical traction collar at home which seemed to help. Dr. Pineo's assessment was chronic headaches, chronic neck pain status-post whiplash injury and narcotic habituation with current evidence of mild withdrawal.[12] Dr. Pineo recommended limitation on the amount of active manipulative therapy by the chiropractor, and he discontinued Lortab, continued Skelaxin and prescribed Prednisone for Plaintiff.[13] (R. 291).

On September 2, 2004, Plaintiff contacted Dr. Pineo's office to report that the Prednisone was causing swelling and that

---

[12]Dr. Pineo's reference to "mild withdrawal" related to Plaintiff's report that he had run out of Lortab the previous Saturday, and that he was feeling "a little more jittery" and was experiencing loose bowel movements. (R. 291).

[13]Prednisone is in a class of medications called corticosteroids. It works to treat patients with low levels of corticosteroids by replacing steroids that are normally produced naturally by the body. It works to treat other conditions by reducing swelling and redness and by changing the way the immune system works. See www.nlm.nih.gov/medlineplus/druginfo (last visited 6/20/2008).

11

Tylenol was not effective for pain relief.[14] As a result, the doctor called in a prescription for Imitrex to Plaintiff's pharmacy.[15] (R. 291). The next day, Plaintiff contacted Dr. Pineo's office to report that the Imitrex was not effective. Plaintiff requested another medication for pain and Dr. Pineo called in a prescription for Lortab to Plaintiff's pharmacy. (R. 290).

On September 11, 2004, MRIs of Plaintiff's cervical spine and brain were performed for "neck pain, constant cephalgia, possible herniated disc and muscular atrophy." The MRI of Plaintiff's cervical spine was within normal limits. The impression of the MRI of Plaintiff's brain was described as follows: (1) tiny polyp or retention cyst along the medial floor of the right maxilary sinus, (2) aplastic right frontal sinus and (3) MRI of the brain is otherwise normal. (R. 351-52).

During his follow-up visit with Dr. Pineo on September 28, 2004, Plaintiff continued to complain of neck and facial pain, reporting that Lortab was the only intervention that was helpful.

---

[14]Tylenol, or acetaminophen, is used to relieve mild to moderate pain from headaches, muscle aches and other conditions. *See* www.nlm.nih.gov/medlineplus/druginfo (last visited 6/20/2008).

[15]Imitrex is used to treat the symptoms of migraine headaches (severe, throbbing headaches that sometimes are accompanied by nausea or sensitivity to sound and light). *See* www.nlm.nih.gov/ medlineplus/druginfo (last visited 6/20/2008).

Dr. Pineo prescribed Methadone for Plaintiff and instructed him to return in one month.[16]  (R. 290).

Plaintiff saw his surgeon, Dr. Te, for a follow-up visit on October 11, 2004.  Plaintiff reported that his headaches since the motor vehicle accident remained "very bothersome," and that he suffered from facial pain which he graded a level 8 or a level 9 without medication.[17]  A nasal endoscopy revealed a left-sided posterior septal spur that was impinging on Plaintiff's left middle turbinate and lateral nasal wall.  Dr. Te believed that the cause of Plaintiff's headaches was possibly rhinogenic, and he started Plaintiff on nasal saline and nasal steroid sprays to reduce his nasal mucosal congestion.  (R. 209).

The next day, October 12, 2004, Plaintiff contacted Dr. Pineo's office to report that Dr. Te may have determined the cause of his headaches, *i.e.*, a deviated septum and nasal inflammation.  Dr. Pineo instructed Plaintiff to stop taking Methadone, and he restarted Lortab because Plaintiff reported that it was more effective for pain relief.  (R. 288-89).

On October 28, 2004, Plaintiff was seen by Dr. Pineo for his continued complaint of headaches.  Dr. Pineo recommended that

---

[16]Methadone is used to relieve moderate to severe pain that has not been relieved by non-narcotic pain relievers.  *See* www. nlm.nih.gov/medlineplus/druginfo (last visited 6/16/2008).

[17]In his office notes of this visit, Dr. Te noted that Plaintiff looked as if he was in chronic pain.  (R. 209).

13

Plaintiff go back to Methadone at an increased dosage to obtain the benefit of long acting pain relief, instead of the short acting pain relief provided by Lortab, and Plaintiff agreed. (R. 288). Two days later, Plaintiff contacted Dr. Pineo's office to report continued headaches and vomiting since he began taking the double dose of Methadone. As a result, Dr. Pineo discontinued Methadone and Plaintiff was restarted on Lortab. (R. 288).

Plaintiff returned to Dr. Te after several weeks of nasal steroid treatment, reporting little improvement in his headaches. On November 1, 2004, Dr. Te examined Plaintiff in connection with his ongoing headaches and nasal obstruction. In light of Plaintiff's lack of improvement with medical treatment, a septoplasty and bilateral inferior turbinate cautery were discussed.[18] Although Dr. Te could not guarantee that the left-sided septal spur and bilateral inferior turbinate hypertrophy were the cause of Plaintiff's headaches, Plaintiff agreed to undergo the surgery, which was performed on November 19, 2004. (R. 177-79, 188-91). During a follow-up visit on November 29, 2004, Dr. Te noted that Plaintiff was doing well. His nasal septum was straight and his inferior turbinates were surgically

---

[18]Septoplasty is an operation that corrects any problems in the wall (nasal septum) that separates the two sides of the nose. www.nlm.nih.gov/medlineplus/druginfo (last visited 6/20/2008).

14

reduced, and Plaintiff reported that his headache was
significantly improved. (R. 209).

On December 8, 2004, Jack P. Failla, M.D., an orthopedic
specialist, evaluated Plaintiff for purposes of Worker's
Compensation. After summarizing the medical records relating to
the injuries sustained by Plaintiff in the work-related motor
vehicle accident on March 3, 2004, Dr. Failla noted that
Plaintiff complained primarily of headaches which were greatly
diminished and left shoulder pain which continued to bother him.
Dr. Failla's examination of Plaintiff revealed full range of
motion in the cervical spine, a completely normal neurological
evaluation, *i.e.*, normal active reflexes, normal sensation and
normal muscle strength, and tenderness of the left bicipital
groove with findings compatible with subacromial bursitis and/or
impingement syndrome. Dr. Failla opined within a reasonable
degree of medical certainty that Plaintiff had recovered from the
whiplash injury sustained in the motor vehicle accident on March
3, 2004; that Plaintiff continued to recover from the facial
injuries sustained on March 3, 2004, which were probably causing
his secondary headaches; that chiropractic care was no longer
indicated or necessary; that it was not clear whether Plaintiff's
shoulder complaints were related to the motor vehicle accident on
March 3, 2004; and that if Plaintiff had any problem requiring
additional treatment, it was treatment to his left shoulder

15

consisting of a repeat injection and physical therapy. As to Plaintiff's whiplash injury, however, Dr. Failla opined that Plaintiff was able to return to work without restriction. (R. 192-94).

During a follow-up visit with Dr. Pineo on December 9, 2004, Plaintiff reported that his facial pain was "much improved." However, he still experienced some headaches and he continued to complain of left shoulder pain. Plaintiff was instructed to use his pain medication as needed, and Dr. Pineo noted that Plaintiff would be referred to another physician for evaluation of his left shoulder pain. Dr. Pineo also noted that he would consider referring Plaintiff to a pain management specialist if appropriate. (R. 287).

Plaintiff saw his surgeon, Dr. Te, for a follow-up visit on December 14, 2004. Dr. Te noted that Plaintiff's "headaches have significantly improved to the point wherein he is not bothered with this anymore. Very happy with results." Dr. Te indicated that with the exception of nasal saline hydration and humidification, no further intervention was required, and he discharged Plaintiff from post-operative care. (R. 208).

On December 20, 2004, based on a referral by Dr. Pineo, Plaintiff was evaluated by Richard S. Richards, M.D., an orthopedic specialist, for left shoulder pain. Plaintiff indicated that the left shoulder pain radiated down his left arm

16

into his hand; that he experienced some numbness in his left arm; and that the pain was aggravated by raising his left arm above shoulder level. An x-ray of Plaintiff's left shoulder was normal, and, after examining Plaintiff, Dr. Richards' assessment was left AC joint osteoarthritis and left shoulder impingement syndrome/bursitis. The doctor administered injections to Plaintiff's left AC joint and left subacromial space, and he recommended that Plaintiff undergo a course of physical therapy to improve the strength of his left shoulder. (R. 197-201). Plaintiff began a physical therapy program at Momentum Therapeutics shortly thereafter for left shoulder pain with decreased range of motion, strength and ability to reach. (R. 245).

Plaintiff returned to Dr. Richards for a follow-up visit on January 12, 2005.[19] Plaintiff reported that the injections helped him; however, he was experiencing anterior proximal biceps pain. After examining Plaintiff, Dr. Richards added left proximal biceps tendonitis to his assessment of Plaintiff's left shoulder pain. The doctor administered an injection to Plaintiff's left proximal biceps tendon and modified Plaintiff's physical therapy plan to include the left biceps. (R. 196).

---

[19]By January 12, 2005, Plaintiff had attended 7 physical therapy sessions at Momentum Therapeutics. Plaintiff continued to report left shoulder pain between a level 1 and a level 4 which was aggravated by overhead activity. (R. 241).

17

Plaintiff's next follow-up visit with Dr. Richards took place on February 2, 2005. Plaintiff reported that the injections helped him and that he was happy with physical therapy. Dr. Richards described the plan for Plaintiff as follows: "Patient has responded appropriately to PT as well as to his injections. Patient does have full ROM, which is 5/5 neuromuscular strength. Patient has not had complete resolution of his pain but is not a danger to himself at this time. I do believe that patient is ready to return back to work. Once I told him that he was cleared to return back to work, he stated to me that his chiropractor is keeping him off work."[20] (R. 196).

On March 3, 2005, an x-ray of Plaintiff's lumbar spine was taken due to his complaint of numbness following a snowmobile accident. The impression was described as "[c]ompression fracture of L1 with compromise of the spinal canal." (R. 203).

In a letter dated March 8, 2005, which appears to have been requested for Worker's Compensation purposes, Dr. Pineo opined that Plaintiff was "clearly in no position to return to his previous occupation of mechanic or electrician due to his chronic neck and head pain and his limited left shoulder range of motion." (R. 285).

---

[20]On February 2, 2005, Dr. Richards discharged Plaintiff from physical therapy. Plaintiff had attended 17 sessions. He continued to complain of left shoulder pain between a level 2 and a level 5, as well as difficulty reaching overhead. However, his range of motion and strength had improved. (R. 234).

18

When Plaintiff saw Dr. Pineo for a follow-up visit on March 10, 2005, he reported continued mild pain in his left shoulder despite three injections by Dr. Richards, as well as "rather severe" headaches for which he had been taking 2 Lortab tablets three to four times a day. Plaintiff also reported feeling a little depressed and a little forgetful. Dr. Pineo added Parafon Forte to Plaintiff's medication regime,[21] and he referred Plaintiff to another physician to consider injections of the "less occipital nerves or cervical spine in general" and a third physician to evaluate Plaintiff's forgetfulness and headaches. In addition, Dr. Pineo prescribed another period of physical therapy for left shoulder pain, which Plaintiff began on March 18, 2005 at Momentum Therapeutics. (R. 232-33, 284).

On March 15, 2005, an x-ray of Plaintiff's cervical spine was taken due to his continued complaints of cervical pain and headaches. The impression was described as "[n]ormal." (R. 202).

On April 7, 2005, Plaintiff was evaluated by a neurologist, Michael K. Matthews, Jr., M.D., for chronic daily headaches based on a referral by Dr. Pineo. Plaintiff reported that the headaches began after a motor vehicle accident on March 3, 2004,

---

[21]Parafon Forte is used to relieve pain and stiffness caused by muscle strains and sprains. It is used in combination with physical therapy, analgesics (such as aspirin or acetaminophen) and rest. *See* www.nlm.nih.gov/medlineplus/druginfo (last visited 6/20/2008).

19

during which he struck the steering wheel of his vehicle with his face just under the nose. Plaintiff also reported left anterior shoulder pain with occasional pain and tingling in four fingers of his left hand. Plaintiff indicated that he had been receiving chiropractic manipulation of his neck, as well as electrical stimulation, with unclear effect, and that he took Lortab and Parafon Forte for the pain. With respect to Plaintiff's mental status, Dr. Matthews noted:

> **REVIEW OF SYSTEMS:** His memory has been somewhat sluggish since the accident, but it is more a nuisance than a significant impairment. It has not changed in the year since the accident. It is not the feature which keeps him out of work. The problem keeping him out of work is headache and neck pain.

After examining Plaintiff, Dr. Matthews described his assessment as follows:

> **ASSESSMENT:**
>
> 1.  Headache mixed with cervicalgia with three principal sources; post concussion, cervical injury, and facial injury.
>     I doubt that migraine is a significant contributor to his headache experience.
> 2.  Post-concussional cognitive impairment relatively mild.

Dr. Richards suggested stimulant medication for Plaintiff's mild cognitive difficulties. However, Plaintiff did not believe that the minor problems presented by these difficulties warranted such an approach. Dr. Richards recommended a limitation on the use of acute pain medication, and he encouraged osteopathic manipulation therapy for Plaintiff. (R. 204-07).

20

On April 19, 2005, Plaintiff's complaints of cervical pain were evaluated by V. Andrei Georgescu, M.D., a pain management specialist, based on a referral by Dr. Pineo. After examining Plaintiff, Dr. Georgescu described his impression as "[p]osterior cervical pain with clinical presentation of occipital neuralgia,"[22] and he recommended occipital nerve blocks. Two days later, Plaintiff underwent his first session of occipital nerve blocks (left greater and lesser, right greater). (R. 268-73). During a follow-up visit with Dr. Georgescu on May 5, 2005, Plaintiff reported a few days' relief following the occipital nerve blocks and then the pain returned. (R. 262). On May 9, 2005, Plaintiff underwent another session of occipital nerve blocks, as well as trigger point injections, for occipital neuralgia and myofascial pain of the posterior cervical area. (R. 258-62).

Plaintiff saw Dr. Pineo for a follow-up visit on May 13, 2005.[23] Plaintiff reported that he had obtained substantial but

---

[22]Neuralgia is pain that follows the path of a specific nerve. The causes of neuralgia vary. Chemical irritation, inflammation, trauma (including surgery), compression of nerves by nearby structures (for instance, tumors), and infections may all lead to neuralgia. In many cases, however, the cause is unknown. *See* www.nlm.nih.gov/medlineplus/encyc (last visited 6/20/2008).

[23]On May 11, 2005, after 14 physical therapy sessions, Dr. Pineo was notified by Momentum Therapeutics that Plaintiff was ready for discharge from physical therapy. At the time, Plaintiff reported that his left shoulder pain ranged from no pain to pain at a level 2. Plaintiff's strength was 5/5 and his

21

transient relief in his neck pain and headaches from the injections administered by Dr. Georgescu; that he felt a "little blue" at times because summer was coming and he could not be more active due to pain; that he still required 1 or 2 tablets of Lortab 4 times a day and muscle relaxers for pain; that his shoulder pain was 75 to 80% resolved; and that his memory remained somewhat impaired. Dr. Pineo instructed Plaintiff to continue treatment with Dr. Georgescu for injections, noting that the next step for Plaintiff would be cervical epidural steroid injections. Dr. Pineo adjusted Plaintiff's medications and instructed him to return in 1 to 2 months. (R. 277). During his follow-up visit with Dr. Georgescu on May 26, 2005, Plaintiff reported five days of pain relief following the last session of injections.[24]  (R. 256-57).

On May 31, 2005, Dr. Georgescu wrote a letter to CUNA Mutual Group on Plaintiff's behalf.[25]  In summary, Dr. Georgescu noted that Plaintiff suffered from chronic neck and shoulder pain with

range of motion was within normal limits. However, Plaintiff continued to report "catch[ing]" upon abduction. (R. 222).

[24]Two days before this follow-up visit, on May 24, 2005, Plaintiff contacted Dr. Pineo's office for a refill of Lortab, and a prescription was called into Plaintiff's pharmacy. On June 2, 2005, Plaintiff contacted Dr. Pineo's office again for a refill of Lortab, and another prescription was called into his pharmacy. (R. 275).

[25]During the administrative hearing, Plaintiff's counsel indicated that Cuna Mutual Group is the insurance company that pays Plaintiff's mortgage while he is disabled. (R. 36).

22

clinical presentation of occipital neuralgia and myofascial pain; that the range of motion in Plaintiff's neck and shoulders was limited; that Plaintiff had undergone a series of occipital nerve blocks and cervical epidural injections; and that Plaintiff was being considered for physical therapy. Dr. Georgescu indicated that Plaintiff's treatment would not be concluded until he received one or two more injections and completed a physical therapy program. In light of the nature of Plaintiff's job, which involved movement of his upper body and neck, Dr. Georgescu opined that Plaintiff would not be able to return to work for at least 4 to 6 weeks. (R. 255).

On June 6, 2005, Dr. Georgescu administered a cervical epidural steroid injection to Plaintiff for a diagnosis of "[c]ervical pain with a possible radicular component." (R. 212-17).

On June 15, 2005, Plaintiff contacted Dr. Pineo's office for a refill of Lortab, and a prescription was called into Plaintiff's pharmacy. (R. 275). The next day, Plaintiff saw Dr. Georgescu for a follow-up visit, reporting that he had obtained no pain relief following the most recent injections. At that time, Dr. Georgescu prescribed a physical therapy program for Plaintiff.[26] (R. 251-53).

---

[26]X-rays (three views) of Plaintiff's cervical spine on June 20, 2005 demonstrated normal alignment and disc spacing, and no fracture, bony destructive process or retropharyngeal soft tissue

23

Plaintiff's initial physical therapy evaluation for headaches and cervical pain took place on June 22, 2005. At the time of the evaluation, Plaintiff rated his pain level a 6 and his headache level an 8, noting that his pain was aggravated by increased activity. Plaintiff reported no feeling in the base of his nose and bottom lip, as well as soreness on palpation. The evaluator assessed the severity of Plaintiff's condition as "moderate" and his rehabilitative potential as "poor," and a treatment plan was formulated. As to frequency, Plaintiff was to attend physical therapy 3 times a week for 4 weeks.[27] (R. 249-51).

Plaintiff saw Dr. Georgescu for a follow-up visit on June 30, 2005. Due to continued complaints of head and neck pain, Dr. Georgescu prescribed Ultram, Zanaflex and Tegretol for Plaintiff.[28] (R. 248). During his follow-up visit with Dr. Georgescu on July 12, 2005, Plaintiff complained of increased

swelling. (R. 218).

[27]Plaintiff returned to Momentum Therapeutics for the physical therapy. He was discharged from physical therapy by Dr. Georgescu on July 11, 2005, due to a lack of progress in the resolution of his headaches and cervical pain. (R. 221).

[28]Ultram is used to relieve moderate to moderately severe pain. Zanaflex is in a class of medications called skeletal muscle relaxants. Tegretol is used to treat, among other conditions, trigeminal neuralgia (a condition that causes facial nerve pain). It is in a class of medications called anti-convulsants. See www.nlm.nih.gov/medlineplus/druginfo (last visited 6/20/2008).

24

pain since starting the Tegretol. As a result, Dr. Georgescu decreased Plaintiff's dosage of Tegretol and added Neurontin and Duragesic to Plaintiff's medication regime.[29]   (R. 246).

A progress note by Dr. Georgescu dated July 14, 2005, states that Plaintiff reported a "minimal" headache the previous day and indicated that he wanted to continue his then current medication regime.   The progress note also states that Dr. Georgescu would consider prescribing Morphine for Plaintiff if his pain was not under control by the next follow-up visit.[30]   (R. 274).   An office note of Dr. Pineo dated July 15, 2005 indicates that

---

[29]Neurontin is used to help control certain types of seizures in patients who have epilepsy and to relieve the pain of postherpetic neuralgia (the burning, stabbing pain or aches that may last for months or years after an attack of shingles). Duragesic is a skin patch that is used to relieve moderate to severe pain that is expected to last for some time, that does not go away, and that cannot be treated with other pain medications. Duragesic is in a class of medications called opiate (narcotic) analgesics.   It works by changing the way the brain and nervous system respond to pain.   *See* www.nlm.nih.gov/medlineplus/druginfo (last visited 6/20/2008).

[30]Morphine is used to relieve moderate to severe pain. Morphine long-acting tablets and capsules are only used by patients who are expected to need medication to relieve moderate to severe pain around-the-clock for longer than a few days. Morphine is in a class of medications called opiate (narcotic) analgesics.   *See* www.nlm.nih.gov/medlineplus/druginfo (last visited 6/20/2008).

25

Plaintiff continued to experience problems with neck pain.[31]  (R. 275).

On October 17, 2005, a State agency physician completed a Physical RFC Assessment in connection with Plaintiff's application for DIB based on a review of the medical evidence in the administrative file.  In summary, the physician opined that Plaintiff could frequently lift and carry 10 pounds and occasionally lift and carry 20 pounds; that Plaintiff could stand and/or walk about 6 hours in an 8-hour work day; that Plaintiff could sit about 6 hours in an 8-hour work day; that Plaintiff's ability to push and pull with his upper and lower extremities was unlimited; and that Plaintiff had no postural, manipulative, visual, communicative or environmental limitations.  (R. 372-78).

Plaintiff was referred to John O'Brien, M.D. for a disability review.  On June 28, 2006, Dr. O'Brien completed a lengthy report for CUNA Mutual Group based on (1) a review of Plaintiff's medical records, (2) the report of an interview of Plaintiff by the doctor's colleague, Cindy Strege, PsyD, LP, and (3) consultations with treating providers Dr. Pineo and Dr.

---

[31]In a disability report completed on January 29, 2007, Plaintiff indicated that he lost his sense of taste on July 20, 2005, resulting in a weight loss of 40 pounds. He also indicated that his doctors did not know whether the loss of his sense of taste was attributable to the accident, his medication or the nerve blocks he received to alleviate his neck pain.  (R. 110).

Paxson.[32]  In his Summary and Conclusions, Dr. O'Brien noted that
Plaintiff had an appointment at the Cleveland Clinic Pain Center
scheduled in the near future; that both Dr. Pineo and Dr. Paxson
were "anxious and anticipating" Plaintiff's visit to that medical
facility; that both physicians appropriately identified
psychological issues which may impact Plaintiff's recovery; and
that both physicians independently recommended formal
neuropsychological testing of Plaintiff, as did he.  Dr. O'Brien
opined that Plaintiff was impaired from his current occupation,
but that he was capable of some type of work based on the results
of a functional capacity evaluation that had been performed.[33]
Dr. O'Brien further opined that the medication Plaintiff was
taking for pain "may have a significant impact on his ability to
function."  (R. 390-401).

    Plaintiff was referred by Dr. Paxson to Dr. Albert J. Scott,
a clinical neuropsychologist, for an evaluation to rule out a

---

[32]In the report, Dr. O'Brien repeatedly misspells Dr.
Paxson's name, *i.e.*, Dr. Paxton or Dr. Paxin.  (R. 390, 398).
During his interview by Dr. O'Brien's colleague, Plaintiff
indicated that he had been referred to Dr. Paxson, a Physical
Medicine and Rehabilitation Specialist, due to his memory
complaints.  (R. 397).  The administrative file in this case does
not contain any medical records of Dr. Paxson.

[33]One of the items of medical evidence that was reviewed by
Dr. O'Brien was a Functional Capacity Evaluation Report dated
February 2, 2006, which is not in Plaintiff's administrative
file.  According to Dr. O'Brien, the report stated, *inter alia*,
that Plaintiff had not given maximum consistent effort during
testing, and that Plaintiff could work 8 hours a day, 40 hours
per week.  (R. 395).

27

traumatic brain injury and posttraumatic stress disorder.

Following eight consultations which took place between June 7, 2006 and August 21, 2006, Dr. Scott prepared a report of Plaintiff's neuropsychological evaluation on August 24, 2006. In the History section of the report, Dr. Scott noted that Dr. Paxson's impressions of Plaintiff's medical conditions included (1) status-post traumatic brain injury and posttraumatic stress syndrome from the March 3, 2004 motor vehicle accident; (2) somatic dysfunction of the cervical and dorsal spines and pelvis; (3) a history of fractures to the face and nose necessitating surgery following the motor vehicle accident; and (4) chronic pain syndrome, predominantly in the neck and dorsal spine. Dr. Scott also noted Dr. Paxson's opinion that Plaintiff was unable to return to work, and that a report prepared by Dr. Paxson on April 18, 2006 suggested that Plaintiff had memory and cognitive difficulties. At that time, Plaintiff's medications included Kadian (oral Morphine), Flexeril, Topomax, Famotidine and Senokot.[34] Dr. Scott administered a number of tests to Plaintiff, noting that he was "totally cooperative with testing."

---

[34]Topamax is used, among other reasons, to prevent migraine headaches, but not to relieve the pain of migraine headaches when they occur. It is in a class of medications called anticonvulsants. Famotidine is used to treat conditions of the stomach caused by the production of too much acid. Senokot is used to treat constipation. *See* www.nlm.nih.gov/medlineplus/druginfo (last visited 6/20/2008). With respect to the inclusion of Senokot in Plaintiff's medication regime, Dr. Scott noted that Plaintiff's other medications caused constipation. (R. 385).

Based on Plaintiff's test results, Dr. Scott's impression was
dementia due to head trauma (mild traumatic brain injury) and a
depressive disorder secondary to head trauma,[35] and he rated
Plaintiff current score on the Global Assessment of Functioning
("GAF") Scale a 40.[36] Dr. Scott concluded his report as follows:

**SUMMARY:** Treating professionals should consider placing the
subject on an antidepressant. There is a need for
individual psychotherapy. A medication such as Aricept may
want to be considered by the treating professionals.[37] A
stimulant may also improve concentration and attention and

---

[35]With respect to Plaintiff's test results, Dr. Scott noted,
*inter alia*, that Plaintiff's profile on the MMPI-II was valid;
there was no evidence of drug or alcohol problems; Plaintiff was
not likely to be a malingerer; the presence of chronic pain was
suggested; and there was an indication of depression. (R. 388).

[36]The GAF scale is used by clinicians to report an
individual's overall level of functioning. It does not evaluate
impairments caused by physical or environmental factors. The GAF
Scale considers psychological, social, and occupational
functioning on a hypothetical continuum of mental health -
illness. The highest possible score is 100 and the lowest is 1.
GAF scores between 31 and 40 denote the following: **"Some
impairment in reality testing or communication** (e.g., speech is
at times illogical, obscure, or irrelevant) **OR major impairment
in several areas, such as work or school, family relations,
judgment, thinking, or mood** (e.g., depressed man avoids friends,
neglects family, and is unable to work; child frequently beats up
younger children, is defiant at home, and is failing at school).
American Psychiatric Association: Diagnostic and Statistical
Manual of Mental Disorders, Fourth Edition, Text Revision.
Washington, DC, American Psychiatric Association, 2000, at 32-34
(bold face in original).

[37]Aricept is used to treat dementia (a brain disorder that
affects the ability to remember, think clearly, communicate, and
perform daily activities and may cause changes in mood and
personality) associated with Alzheimer's disease. *See* www.nlm.
nih.gov/medlineplus/druginfo (last visited 6/20/2008)

improve depression. Cognitive rehabilitation is necessary. The present evaluator sees no evidence of a PTSD. These findings are consistent with a mild frontal temporal dementia.

(R. 384-89).

On December 14, 2006, Plaintiff was seen by Brian Cicuto, D.O., a pain specialist, to be evaluated for an interdisciplinary pain rehabilitation program. Plaintiff's chief complaints were noted to be chronic headache pain, neck pain and facial pain. After reviewing Plaintiff's history and performing a physical examination, Dr. Cicuto's impressions included (1) cervicalgia, headache pain, myofascial pain, and occipital neuralgia; contributing factor, surgery after motor vehicle accident; (2) deconditioning; (3) reduced functionality, doing very little around the home at present; and (4) cognitive changes post-accident revealed on neuropsychiatric testing. Dr. Cicuto gave Plaintiff and his wife information on the interdisciplinary pain rehabilitation program, indicating that he believed Plaintiff could eventually return to some type of work following the rehabilitation program. Dr. Cicuto also suggested a gradual decrease in Plaintiff's use of opioid (narcotic) analgesics to control his pain. Finally, Dr. Cicuto indicated that he would see Plaintiff again if he was truly interested in the program. (R. 381).

30

## III. Legal Analysis

### A. Jurisdiction and Standard of Review

The Court has jurisdiction of this appeal under 42 U.S.C. § 405(g), which provides that an individual may obtain judicial review of any final decision of the Commissioner by bringing a civil action in the district court of the United States for the judicial district in which the plaintiff resides.

The Court's review of the Commissioner's decision is limited to determining whether the decision is supported by substantial evidence, which has been described as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971). It consists of something more than a mere scintilla, but something less than a preponderance. Dobrowolsky v. Califano, 606 F.2d 403, 406 (3d Cir.1979).

To constitute substantial evidence, "it must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury." See Monsour Medical Center v. Heckler, 806 F.2d 1185, 1190 (3d Cir.1986), citing, Universal Camera Corp. v. NLRB, 340 U.S. 474, 477 (1951). Even if the Court would have decided the case differently, it must accord deference to the Commissioner and affirm the findings and decision if supported by substantial evidence. Id. at 1190-91.

## B. The ALJ's Decision

In order to establish a disability under the Social Security Act, a claimant must demonstrate an inability to engage in any substantial gainful activity due to a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1). A claimant is considered unable to engage in any substantial gainful activity only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. § 423(d)(2)(A).

In Burnett v. Commissioner of Social Security Admin., 220 F.3d 112 (3d Cir.2000), the Third Circuit discussed the procedure an ALJ must follow in evaluating a claim for Social Security disability benefits, stating in relevant part:

\* \* \*

In Plummer, we recounted the five step sequential evaluation for determining whether a claimant is under a disability, as set forth in 20 C.F.R. § 404.1520:

In step one, the Commissioner must determine whether the claimant is currently engaging in substantial gainful activity. 20 C.F.R. § 404.1520(a). If a claimant is found to be engaged in substantial gainful activity, the disability claim will be denied. Bowen v. Yuckert, 482 U.S. 137, 140, 107 S.Ct. 2287,

2290-91, 96 L.Ed.2d 119 (1987). In step two, the
Commissioner must determine whether the claimant is
suffering from a severe impairment. 20 C.F.R.
§ 404.1520(c). If the claimant fails to show that her
impairments are "severe," she is ineligible for
disability benefits.

In step three, the Commissioner compares the
medical evidence of the claimant's impairment to a list
of impairments presumed severe enough to preclude any
gainful work. 20 C.F.R. § 404.1520(d). If a claimant
does not suffer from a listed impairment or its
equivalent, the analysis proceeds to steps four and
five. Step four requires the ALJ to consider whether
the claimant retains the residual functional capacity
to perform her past relevant work. 20 C.F.R.
§ 404.1520(d). The claimant bears the burden of
demonstrating an inability to return to her past
relevant work. Adorno v. Shalala, 40 F.3d 43, 46 (3d
Cir.1994).

If the claimant is unable to resume her former
occupation, the evaluation moves to the final step. At
this stage, the burden of production shifts to the
Commissioner, who must demonstrate the claimant is
capable of performing other available work in order to
deny a claim of disability. 20 C.F.R. § 404.1520(f).
The ALJ must show there are other jobs existing in
significant numbers in the national economy which the
claimant can perform, consistent with her medical
impairments, age, education, past work experience, and
residual functional capacity. The ALJ must analyze the
cumulative effects of all the claimant's impairments in
determining whether she is capable of performing work
and is not disabled.

Plummer, 186 F.3d at 428.

\* \* \*

220 F.3d at 118-19.

With respect to the ALJ's application of the five-step
sequential evaluation process in the present case, steps one and
two were resolved in Plaintiff's favor: that is, the ALJ found

33

that Plaintiff had not engaged in substantial gainful activity
since his alleged onset date of disability, and the medical
evidence established that Plaintiff has the following severe
impairments: left shoulder acromioclavicular osteoarthritis and
impingement, cervicalgia (a painful condition of the cervical
spine), occipital neuralgia (pain in the distribution of the
occipital nerves), myofascial pain, a chronic pain syndrome, a
post-concussive syndrome and a depressive disorder. (R. 13).
Turning to step three, the ALJ found that Plaintiff's impairments
are not sufficiently severe to meet or equal the requirements of
any of the listed impairments in 20 C.F.R., Pt. 404, Subpt. P,
App. 1. (R. 13-14). As to step four, the ALJ found that
Plaintiff is unable to perform any of his past relevant work due
to the exertion levels of those jobs, *i.e.*, heavy. (R. 22).
Finally, regarding step five, based on the testimony of the VE,
the ALJ found that considering Plaintiff's age, education, past
work experience and RFC, there are a significant number of jobs
in the national economy at the light exertional level which
Plaintiff could perform, including the jobs of an unarmed guard,
a bench assembler and a hand worker. (R. 23).

## C. Discussion

Although not clearly delineated, the brief filed by
Plaintiff in support of his motion for summary judgment raises
the following arguments: (1) the ALJ's credibility determination

34

was erroneous; (2) the ALJ erred by failing to consider the combined effect of Plaintiff's physical and mental impairments; and (3) the ALJ erred by failing to take into consideration the entirety of the VE's testimony. After careful consideration, the Court finds that Plaintiff's first and second arguments are unavailing. As to Plaintiff's third argument, however, the Court will remand the case for further proceedings.

## Credibility Determination

Under the Social Security Regulations, evaluation of a claimant's symptoms, including pain, is a two-step process. First, the ALJ must determine whether the evidence includes medical signs and laboratory findings which show that the claimant has a medical impairment which could reasonably be expected to produce the symptoms alleged. 20 C.F.R. § 404.1529(b). If such an impairment is shown, the ALJ must then evaluate the intensity, persistence and limiting effects of the claimant's symptoms to determine the extent to which the symptoms

35

limit the claimant's ability to do basic work activities.[38]   20
C.F.R. § 404.1529(c)(1).

In the present case, the ALJ found that Plaintiff's
medically determinable impairments could reasonably be expected
to produce pain and cognitive impairment, but that Plaintiff's
statements concerning the intensity, persistence and limiting
effects of his pain and cognitive impairment were not entirely
credible.  (R. 16).  After consideration, the Court is compelled
to conclude that the ALJ's credibility determination is supported
by substantial evidence.

First, the ALJ considered Plaintiff's testimony at the
administrative hearing regarding his daily activities (R. 16),
noting that Plaintiff testified he is able to dress himself, make
a sandwich, wash dishes, watch television, grip, grasp, pinch and
pickup objects with his hands, stand without a problem, descend
stairs without a problem, walk if he does not jar his neck,

_____

[38]Factors that are relevant to a claimant's symptoms, such as
pain, which will be considered by the ALJ include: (a) the
claimant's daily activities; (b) the location, duration,
frequency and intensity of the claimant's pain or other symptoms;
(c) factors that precipitate or aggravate the pain or other
symptoms; (d) the type, dosage, effectiveness and side effects of
any medication the claimant takes or has taken to alleviate pain
or other symptoms; (e) treatment, other than medication, that the
claimant receives, or has received, for relief of pain or other
symptoms; (f) any measures other than treatment the claimant
uses, or has used, to relieve his or her pain or other symptoms;
and (g) any other factors concerning the claimant's functional
limitations and restrictions due to pain or other symptoms.   20
C.F.R. § 1529(c)(3).  *See also* Social Security Ruling 96-7p.

36

safely operate a motor vehicle, get along with people and go to church once or twice a week. (R. 32-34, 40).

Next, the ALJ considered Daily Activities Questionnaires completed by Plaintiff on July 26, 2005 and March 29, 2007. The ALJ noted that in the earlier questionnaire, Plaintiff indicated that, despite severe pain, he was not dependent on someone else for care; he did not have to make any changes with respect to personal care; he could shower and dress himself without resting; he did not have to decrease the frequency with which he drives; and he could walk normal distances and climb stairs as needed as long as he did not jar his head and neck. The ALJ also noted that, despite some cognitive impairment, Plaintiff indicated in the earlier questionnaire that he could pay his bills, and that there was no change in his ability to watch television and movies. (R. 16, 103-09).

Turning to the latter questionnaire, which was completed less than a week before the administrative hearing, the ALJ noted that, despite severe pain, Plaintiff indicated that he sometimes did the dishes; that he was able to make himself a sandwich and do light shopping; and that he went to church weekly. Further, despite some cognitive impairment, Plaintiff indicated that he watched television, including the Discovery Channel, the Learning Channel, the "How-to" Channel and PBS. Moreover, Plaintiff

reported that he was starting to draw, and that he built jigsaw puzzles. (R. 17, 120-24).

Next, the ALJ considered the following statements by Plaintiff which did not support his allegations of disabling pain and significant cognitive impairment since the motor vehicle accident on March 3, 2004:[39]

(a) on December 8, 2004, Plaintiff told Dr. Failla, a consultative examiner for purposes of Worker's Compensation, that his headaches had "improved dramatically" and were "nearly gone" since the surgery on his nasal septum (R. 193);

(b) on December 9, 2004, Plaintiff told Dr. Pineo, his primary care physician, that although he still had some headaches in the posterior neck, his facial pain was "much improved" (R. 286);

(c) on December 14, 2004, Plaintiff told Dr. Te, the surgeon who performed his septoplasty, that his headaches had "significantly improved to the point wherein he is not bothered with this anymore" (R. 208);

(d) on March 3, 2005, Plaintiff underwent an MRI of his lumbar spine, apparently reporting that he had been involved in a snowmobile accident which suggests an ability to be more active than Plaintiff admitted to in either his testimony or the Daily Activities Questionnaires (R. 203);

---

[39] (R. 17).

38

(e) on March 10, 2005, Plaintiff told Dr. Pineo that he continued to have "mild" pain in his left shoulder pain (R. 284);

(f) on April 7, 2005, Plaintiff told Dr. Matthews, the neurologist to whom Plaintiff was referred by Dr. Pineo, that, although his memory had been "somewhat sluggish" since the motor vehicle accident, it was "more a nuisance than a significant impairment;" that it had not "changed in the year since the accident;" that it was not the problem which prevented him from working; and that, due to the minor problems presented by his "sluggish" memory, he did not believe stimulant medication was warranted (R. 204-04);

(g) on May 11, 2005, during a physical therapy session, Plaintiff reported that his left shoulder pain ranged from no pain to a pain level of 2 (R. 222);

(h) on May 13, 2005, Plaintiff told Dr. Pineo that his left shoulder pain was "75-85% resolved" (R. 277); and

(i) on July 14, 2005, Plaintiff told Dr. Georgescu, the pain management specialist to whom Plaintiff was referred by Dr. Pineo, that his headache the previous day had been "minimal." (R. 274).

Finally, the ALJ considered the objective medical evidence in Plaintiff's administrative file, noting numerous medical records, physical therapy notes and test results that did not support Plaintiff's complaints of disabling pain and significant

39

cognitive impairment since the March 2004 motor vehicle accident. (R. 17-21).

Based on the foregoing evidence, the Court cannot conclude that the ALJ erred by failing to credit Plaintiff's pain and cognitive impairment complaints in their entirety.

## Combination of Physical and Mental Impairments

Plaintiff also contends that the ALJ erred by failing to consider the combined effects of his physical and mental impairments. A review of the ALJ's decision, however, fails to support this contention. The ALJ addressed Plaintiff's physical impairments and mental impairment throughout the decision, and his assessment of Plaintiff's RFC included both physical (light work with no overhead reaching) and mental limitations (simple, routine tasks, no exposure to hazardous equipment). Under the circumstances, the Court finds this argument meritless.

## VE's Testimony

Based on the VE's response to a hypothetical question at the administrative hearing, the ALJ concluded that Plaintiff retained the RFC to perform a range of light work existing in significant numbers in the national economy. As noted by Plaintiff, however, the ALJ failed to address significant, uncontradicted testimony of the VE which did not support his adverse decision in this case. Specifically, when asked by Plaintiff's counsel if an employer would hire an individual who took the narcotic

40

medications that are prescribed for Plaintiff by his treating physicians for pain control, the VE responded: "It's not 100%, but clearly the majority of employers would not [allow] someone working in their facility with the types of drugs you mentioned, that he has mentioned."[40] (R. 50).

The ALJ's failure to address this portion of the VE's testimony is particularly troubling in light of his conclusion that Plaintiff did not retain the RFC to perform the full range of light work because the testimony at issue further erodes the number of jobs that would be available to Plaintiff. Stated differently, based on the ALJ's failure to pursue the VE's response to the question of Plaintiff's counsel regarding his well-documented daily use of narcotic pain medications, it was not determined whether there remained a significant number of jobs in the national economy which Plaintiff could perform. Accordingly, the case will be remanded to the ALJ to address the VE's testimony that the majority of employers would not hire an individual who took the narcotic pain medications that Plaintiff had used on a daily basis between the March 3, 2004 motor vehicle

---

[40]The brief filed by the Commissioner in support of his cross-motion for summary judgment also fails to discuss the VE's testimony in this regard.

accident and the date of the administrative hearing.[41]

_William L. Standish_

William L. Standish
United States District Judge

Date: June $\underline{26}$, 2008

---

[41]If, on remand, the evidence establishes that Plaintiff no longer takes narcotic medications for pain control, the ALJ should consider Plaintiff's entitlement to DIB for a closed period.